17-2234 Good afternoon, Your Honors. And may it please the Court, my name is Gregory Bishoping and I represent Alejandro Saravia. If it pleases the Court, I'd like to reserve three minutes of rebuttal. That would be great. Your Honors, despite this Court's ruling and failed V.A.'s Ogaldamez, the V.I.A. has steadfastly refused even to acknowledge that it has changed the test for a particular social group. Say that again? I'm sorry. Say that again? Go ahead. The V.I.A. has failed to acknowledge Yeah, the V.I.A. has failed to acknowledge that it's even changed the test for a particular social group. Well, I don't mean to throw you a curveball, but maybe we could deal with what the Attorney General did the other day, the A.V. case. I'm sure you've seen it, right? Yes. Okay, how does that play into our analysis now? Well, I think that that decision is a perfect example of the results-driven nature of this particularity and social distinction test. There the Attorney General prejudged two entire classes of applicants, domestic violence victims and gang-related violence applicants. And, in fact, gang-related violence applicants were not in dispute in that case. Even if that's all true, isn't it entitled to a high degree of deference? It's entitled to the Chevron framework of deference, which under the first prong asks whether or not the statute is ambiguous. And this particular part of the statute has been found to be ambiguous. Say that again? Is not ambiguous? No, apologies. This particular part of the statute has been found to be ambiguous. Now, the second prong of Chevron asks, is this interpretation reasonable? And in Valdiviezo-Galdamez, this court found that the interpretation of the statute to require particularity and social distinction was not reasonable because it was a change from the prior standard set under ACOSTA, which required only an immutable characteristic. And the BI had not provided a reasoned explanation for that change. And in providing that reasoned explanation provided applicants clarity on what would be required, such as clarifying what's good precedent and what's bad precedent. So this AB case is not that, I guess? It doesn't meet that standard? No. And, in fact, this AB- But didn't they recognize you? You started off with pointing out they never really said that we changed anything. Didn't Attorney General's opinion at least acknowledge that there has been a change here? It does something similar to what's been done in MEVG and other of the BIA's decisions, which is say that we've refined this over time, that going to the heart of the initial ACOSTA standard, this provides clarity. But it doesn't acknowledge that it's a change. And what's more important, it doesn't clarify what's good precedent and what's bad precedent. And this Court held that there is contradictory precedent coming from the ACOSTA standard, such as the matter of Kasinga, which was on women who opposed female genital mutilation and who have not experienced it. This Court found, based on that record, that there was no evidence that that group was socially distinct in any way. And what the BIA has effectively done since is try to rewrite its prior decisions, saying that, well, there could have been social distinction there. When, in fact, the records of those cases, I think the other cases cited in WBA's over matter of Fuentes and matter of Togo Alfonso, where there was no record of social distinction, and yet the BIA goes back and says, well, there could have been, so it's consistent. Now, as I understand it, these statutes were always written in terms of, well, the Attorney General can grant asylum and so forth. And the BIA is, in effect, inferior to the Attorney General. Is that right? So in certain circumstances, that's right. Under a pure asylum claim, the Attorney General has discretion to deny asylum. However, this is a withholding of removal, which has a higher burden of proof, and therefore, if the standard is met, mandates withholding of removal. So there's less discretion in the final determination. Does that answer your question? I'm not sure. I frankly haven't had a chance. I just got to read the Attorney General's opinion. I'm going to read it after this argument. In the withholding of removal context, hasn't it always been the case in regards to persecution that there be government involvement in the persecution? There's a requirement that the government isn't able to control. For purposes of asylum. For purposes of asylum, I believe the requirement is that the government isn't able to control the persecuting target, which I wasn't even finding. Well, if the government condones the private actions or is not able to control it, don't you have to show those two things before you can get asylum on grounds of persecution? So I believe you do. Now, the IJ and the BIA didn't find that to be a problem with this case at hand? I'm reading the Attorney General's, I guess you could call it decision of the BIA. Yes. If we disagree with you, we defer to what the Attorney General and or the BIA has done. Can you still prevail? So are you saying that if you find that particularity and social distinction are valid? Well, at least the way they view it. Right. Yes, I believe it still requires reversal and remand. The BIA also mischaracterized Mr. Serafi as a particular social group. They described him as part of a social group of individuals looked at to be recruited. In fact, the particular social group he had defined was young men targeted for recruitment who resist recruitment and oppose gang violence and are persecuted on account of that social group. It doesn't sound like much of a difference to me. What's the difference? I mean, one is very vague in general and retracted, whereas this one that we're describing describes a past act on the part and a belief on the part of Mr. Serafi, that of opposition to gang violence and active resistance to gang violence versus purely the actions of another looking at you to be recruited. And, in fact, one of the things that the IJ and BIA found was no nexus between the social group and the persecution he suffered. Now, this is also infected by this wrongful characterization of his particular social group, but it's also counter to the vast weight of the evidence that was seen in the record. In fact, the IJ found that the BIA offered Mr. Serafi an ultimatum of either join our gang, pay us $15,000, or we will kill you. Now, this court has recently overturned three BIA decisions on the grounds of nexus, finding that their nexus determination was inaccurate. Those were Hernandez, Aguirre, and Valdiviezo in the first instance before this court. And warrants for remand on that issue as well here. I actually was focusing in this case on the corroboration issue, which I thought was, you know, unfortunately the immigration judge heard testimony and then said you didn't corroborate it without telling the petitioner what he should have corroborated. And I thought that was ludicrous. But then I got the Attorney General's memo and read this, and I wondered if this pretty much dictates the results in the case as opposed to the corroboration issue. Yeah. So are you asking about the corroboration issue right now, or are you asking more about the Attorney General's? Well, we've already, I think, addressed the corroboration issue. I thought that that was pretty much in your favor until I got the Attorney General's memo. So I'm pretty much focusing on that at the moment and trying to determine just how it's applied in your case, how it's applied in many of these cases. So the Attorney General's decision. Especially with regard to the deference that we give the Attorney General. Sure. So the Attorney General's decision really doesn't change the standard any. It basically reiterates the standard and says that matter of ARCG is overturned because it wasn't in line with that standard. And we actually assert the same thing. In our brief, we say matter of ARCG is one of many examples of inconsistency with this standard. Now, in so doing, he offers additional dicta that no victim of domestic violence and likely no victim of gang violence would qualify, which isn't entitled to deference. Well, unless you show that the government condoned the private actions  What about here? Is that met? No, actually what Judge Flint has just said about the government either condoning or not protecting. Yes, that's more than met here. There's significant evidence put forward that all these were reported. Numerous instances were reported to police with nothing happening. That him and his family were threatened that if they went to the police, there would be significant retaliation, which they believed and didn't go to the police on. Did the I.G.A. render any findings on this? The I.G.A. didn't rule on this. The Vestmire Reflection didn't rule one way or the other. Effectively, I believe conceding that there was a finding of no ability to control the police. There were some tragedies in this case, I thought. Killing were two. Relatives of the petitioner. But again, the question remains was did the government condone that crime? Or were they complicit? I don't see any evidence here that that's the case. They don't have to be explicitly complicit. The report of complacency comes at the Convention Against Torture. Just focus on condoning as opposed to being complicit. For withholding of removal, they don't have to necessarily even condone. They just have to be unable to control. The condoning or complicitness comes in the Convention Against Torture analysis. And withholding of removal is just unable to control. It's a somewhat lower standard. Matter of A.D. references condone the private actions. Okay. Or demonstrate an inability to protect the victim. Okay, that was the language I was focusing on was the inability to control, which was, I believe, at least an implicit finding by the I.G.A. in this case. I would also note that the inconsistency between the particularity and social distinction requirements and the ACOSTA standard of immutability is seen in its courts and the BIA's interpretation of other categories of protection from removal, such as religion and political opinion. In those cases, there's been zero requirement of social distinction, which the BIA ruled in matter of ACOSTA that it was interpreting the statute according to a justum generis meaning of white kind. And this change in standard brings particular social group of a different kind than these other requirements. For instance, matter of S.A., the BIA recognized a protectable religion of a young woman who had more progressive Muslim beliefs than her father, which is in no way socially distinct. And similarly, in imputed political opinion cases, which this court recognizes, those cases turn solely on the actions and beliefs of the persecutors in perceiving a political opinion in the persecuted. In terms of a remedy, could you give us an explicit remedy that you're seeking? Yes. I heard you say remand to the BIA, which in turn will remand to the immigration judge. Precisely. For what remedy? Upholding the court's decision to fail the VASO, granting no chevron deference to particularity and social distinction as requirements of a particular social group. So to either adjudicate under the ACOSTA standard or to provide a principled reason and explanation of the new test, to also reverse nexus and corroboration. Because, which we didn't get to, but in corroboration, the requested testimony was in fact corroborated in the report. So to reverse on those grounds as well. Thank you, counsel. Thank you. Thank you. May it please the court. Good afternoon. Attorney Sabatino F. Leo on behalf of the United States Attorney General. I think that the record is clear and that the case law is clear that in MEVR and MEVG and WGR that the Attorney General via the BIA specifically refined the test and the concerns that this court had involving VASOs. Is it a new test or is it a restatement of old cases? Your Honor, it is simply a refinement. And I think what we really need to step back for a moment is look at what Valdez-Viezo said and specifically what Judge Hardeman indicated in his concurrence is that there really was this additional step of social visibility, which was interpreted by this court as being ocular visibility. Can we see the difference? And Judge Hardeman had very, the entire panel had very great pains in that. And I think that's really the difference is that what their pain, what they had great pains to having a concern with that was ocular visibility would in an event upend all these previous particular social groups for purposes of asylum withholding of removal. And what MEVG and WGR do is they come in and they say, whoa, we never meant ocular visibility and we used a poor phrase by discussing social visibility. What that phrase really meant was social distinction. And what social distinction means, and as MEVG and WGR and the board rectifies, is that what it means is does society perceive this group as a group? And in looking backwards, what the BIA did in those cases was look at the particular social groups that they had previously filed. By group you mean the gangs that try to recruit you and things like that. And according to the petition here, subjective violence and those kinds of things. I think what the board does is say those, with regard to particularity and social distinction, that those are not socially distinct groups. Individuals, and I think what the Attorney General does a good job is in MEVG, he says particular social groups was never meant to remedy the ills of the entire world. Our asylum withholding was never meant to do that. In particular social groups, as sort of the evidence and the legacy makes clear, is that it was never a catch-all. It didn't mean race, religion, nationality, political opinion, or particular social group, which is everything else. It really needed to be something particular. Well, I've heard of a group called MR or M13 or something. It refers to a group that are hell-bent on violence and always getting new recruits via killing, intimidation, etc. Do I qualify? No, Your Honor. Your Honor is viewing it in the eyes of the persecutors versus those who are being persecuted. The group, the particular social group, is not MS13, that is the group, which we can all sit here and agree that that is a group. Mara Salvatrucha 13 is a heinous, gang-violent group. It's whether or not those young men being recruited by MS13, are they socially distinct? Are they particular with respect for purposes of withholding asylum, particularly with regard to particular social groups? And I think what the Board says here is they're not because the entire community or the entire nations in El Salvador. So I'm trying to follow you, but what we're looking for is a group of people that would be persecuted or the targets of the gang violence. We don't look at the persecutors, which would be the group of those that are seeking to recruit. What the Board has said is that in order to define particular social group, what we need to look is at those being persecuted. Are they socially distinct? Not the persecutors. Not the persecutors. But that doesn't make sense. I mean, you're trying to get away from the persecutors, and that's why you flee that country. And that's why you're seeking asylum, because you're trying to get away. And I understand Your Honor's concern, but I think in looking at that, if we were to perceive or view the INA, particular social group aspect of it, within the eyes of the persecutor, then it would engulf the definition of particular social group, meaning every particular social group is persecuted on account of a particular social group, which in turn would render the on account of language in the statute superfluous. And I think that's what the Board has done specifically to state. This on account of language is a separate and distinct delineation. You have a particular social group. Now let's go ahead and make that determination of whether or not this particular social group, common immutable characteristics, particularity, social distinction, we have our group. Is that group being persecuted on account of a protected ground? When the Attorney General says that the applicant must show that the government condoned the private actions, that refers to the persecuted or the persecutor? That refers to the persecutor. So we're in a situation, is the government condoning, unable, or unwilling to protect those that are being persecuted? There has to be that requirement there. It's not simply, and I think what the Board does at nauseam, and this Court has continued to affirm those cases with regard to victims of general criminal strife that are not persecuted on account of a particular social group or any of the other groups that work in the statute. And what the Attorney General is saying is delineating that. In order to establish asylum withholding of removal, you mentioned the quotation from the Attorney General condoning, unable or unwilling. And I think that is really the delineation when it comes to an applicant seeking asylum, which is not here, not the issue in this case, but speaking to your question, as well as withholding of removal. Is that element there? And for purposes of a particular social group, the only way to interpret this particular statute, as I think the AG says in matter of AB, as well as the Board, the MEVG and WGR says we need to look at whether or not this is a particular social group. Now, this Court has already indicated in its Fox team decision that particular social group, that language is ambiguous. Therefore, subject to the deference of the Attorney General, which was a great big deference in matter of ACOSTA. What would be your request? What would you be asking us to do in this case, given the Attorney General's recent? I would think that in this particular case that this Court would grant Chevron deference to the agency's interpretation of particular social group. Now, we haven't heard you talk about the Valdezzo-Galamez case much. Doesn't that point in a different direction in terms of the deference we ought to give to the different things you're citing? Well, I think what's important about Valdezzo-Galamez was that what the concern was there is the judges viewed it as a change to the standard. Social distinction, that is social visibility. As a result, they kicked it back and said, listen, we're demanding to the agency, what do you mean social visibility? Because if we look at social visibility, it doesn't line up with these line of cases with regard to particular social group. What the agency does, I think, is respond directly. I know there's discussion of principled rationale. I think they take MEVG and its companion case in WGR and specifically answer and rectify the concerns of this Court in WVA. So specifically with regard to that ocular visibility, again, looking at X and knowing that X is a member of a particular social group, that's wrong. That was not what the agency meant. And I think what the agency does a good job at is it comes in and it states, we never meant ocular visibility. Because if we did, admittedly, I think they fall on their swords, so to speak. Then it wouldn't line up with our particular social group cases we've done in the past. What we meant was social distinction. So that brings us then to what the Attorney General did two days ago. Judge Greenberg asked a good question. You've got the BIA and then you've got the Attorney General. Is the Attorney General's opinion entitled to even greater deference? How do we deal with that? Well, the statute delegates authority to the executive agency, the Attorney General, for purposes of this immigration. And what the Attorney General did was delegate his or her authority to the Board of the Immigration Judge for purposes of, under the Immigration and Nationality Act, purposes of immigration authority. So, obviously, when the cabinet level matter AB Attorney General speaks, this court should afford deference to it. Whether or not it's afforded a greater amount of deference, I think that the Chevron deference application is really the correct route to go for the simple fact that is there an ambiguous statute? We've already made that determination in Fatim with regard to a particular social group. And then the subsequent question really is, is this a permissible construction of a statute? And permissible construction meaning is it arbitrary, is it capricious, is it manifestly contrary to law? Are you suggesting that the court decide the case or that the agency decide the case or that the Attorney General's statement is final? I think this court should fall in line with, I believe, there's eight other circuits that state specifically that the boards interpret the agencies, for lack of a better term, the agency's interpretation of a particular social group to include common immutable characteristics, particularity, and social distinction warrant Chevron deference. And in my opinion, that effectively ends this case. Because if there's no particular social group, this individual is not qualified for withholding or removal for purposes of withholding. Obviously, convention against torture is a different aspect of it. Can I just shift you a little bit about corroboration? It seems looking at our precedent, Abdoulaye and I guess other things, the IJ didn't really match up, did he? Well, I think in this particular situation with regard to corroboration, we have evidence on the record in which the immigration judge, only as the immigration judge with respect to discusses Abdoulaye as well as standing in the decision, we have on the record discussion between the immigration judge, counsel, as well as petitioner responding at that particular hearing with regard to this lack of corroboration and a response therefrom. Now, I must say that for purposes of immigration judge hearings, there's a lot of, through a lot of cases, and this is a situation in which we have literally a situation where why did you not bring, have a letter or testimony from your mother, letter or testimony from your brother, and the attorney, the petitioner in that particular case, in that situation states, well, we were never told to bring my mother, and then the attorney representing basically falls on his sword. The IJ is going to make a decision on the basis of corroboration, and we have said you have to tell the petitioner what needs corroboration so that you can prepare to bring it. In this case, apparently his mother did not, was available to testify, but then the IJ made a decision that had to do with that. Petitioner was pressed by the immigration judge on the record, petitioner's counsel. Petitioner's counsel said, hey, we have no, we have absolutely no excuse for that, and counsel effectively fell on their sword, did not propose to offer, did not propose to continue, did not take any. But the IJ has to say that matter needs to be corroborated. Well, I think he says on the record with regard to corroboration specifically, and this is assuming we get to corroboration for purposes of this decision, but specifically with regard to the mother and the half brother, no, there being no letters and there being no evidence, and I think it's important to recognize, and again, I think this court as well as numerous circuit courts have indicated, perhaps this is a tactical decision by counsel not to present evidence in response. I don't know. Perhaps the mother wasn't prepared to corroborate the testimony. Perhaps the half brother wasn't prepared to corroborate. We can't now at a 20,000-foot level now question what it could conceivably have been a tactical decision. I will say to this court, as an officer of this court, we're looking at a situation in which we have an immigration judge looking at the petitioner and petitioner's counsel, specifically inquiring with regard to corroboration and no subsequent corroboration being submitted. Again, we don't believe as the attorney general that you even get there because petitioner's particular social group is not a particular social group, and this court should grant deference to the agency's decision with regard to particular social groups, and as a result, it is there for purposes of his claim for withholding of removal. Yeah, you don't have much time. Wrap it up soon, I guess. Okay, Your Honor. So in short, we think it's clear that the MEDG and WGR, the board's decision, now piggybacked by the AB decision by the attorney general, make it abundantly clear that for purposes of a particular social group, the particular social group is ambiguous, and that this court should defer to the agency's definition as it's neither arbitrary, nor capricious, nor manifestly contrary to law. Your Honor, the request, Mr. Leo, is that we decide the case as opposed to sending it back to the IJ, excuse me, the BIA. I think that all this court needs to do is defer. If this court defers to the grant Chevron deference to the board's decision in this particular case, then deny the petition, and then that would be it in our opinion. You should deny the petition. Thank you, Your Honor. Thank you, counsel. We'll hear rebuttal. Thank you, Your Honors. I'd just like to respond briefly on a couple points. One, to address, Judge Fuentes, your earlier questions about the requirement of condoning. I just want to ask, is this Mr. Bishop? Yes. Okay. To respond briefly to your earlier questions, that was distinct because in asylum, there's a different definition of persecution that includes this language of condoning or unable to control, whereas in withholding of removal, there is no such language in the definition of persecution. And that decision was in the asylum context. I would also note, in response to opposing counsel's discussion of ocular visibility, that argument was addressed in Valdivieso-Galdanas. There, the court heard this exact argument and ruled that that was a gloss with what the BIA was actually doing, because in RE-CA, which was one of the first cases that applied this new test, they explicitly looked for ocular visibility. And even if this standard is now interpreted to not require ocular visibility, non-ocular social distinction is still at odds with the records that were developed in those earlier ACOSTA standard cases. Next, the opposing counsel discusses the persecutor's perspective in response to Your Honor's questions, and I believe one of the biggest problems with this new test for particularity and social distinction is the changing importance that the BIA gives to the persecutor's perspective in defining what is a particular social group. In early cases, like in RE-CA, the board looks to the persecutors to say, is this group distinct? And in later cases, it looks to society to ask whether. Isn't it entitled to refine its approach? Yes, but applicants are entitled to know how to plead their case. They should know what the standard is so that they can develop the record accordingly to meet that. Lastly, corroboration was discussed, and I would like to note that I think one of the biggest problems with the corroboration analysis below was, on top of the notice issue, was the fact that the corroboration that was requested was, in fact, provided. A psychologist interviewed Mr. Saravia's mother and submitted to the court was the interview where she corroborated the exact testimony that was requested. The psychologist wrote, Ms. Melendez stated that in February 2016 she received a call from an unknown number. The caller said, Ms. Melendez, is it true that your son is coming to El Salvador? Yes, Alejandro is coming. Do you have to negotiate, or do you know when it's going to happen to him? This shows a failure to meet Abdulai, which says the IJ has to ask, is the evidence already corroborated? If you're honest, I have no further questions. I believe that concludes my presentation. All right, counsel, thank you so much. First off, I just want to thank counsel and his colleagues over here for taking on this case pro bono, and I hope Mr. Saravia knows how well he's been represented. We also want to thank the government. Briefing and argument were excellent. Here we'll take the case under advisement and ask that the clerk and chair and court would like to greet you at sidebar as well. So thank you. Please rise. This court stands adjourned until Thursday, June 14th at 9.30 a.m.